FILED

02/12/2026

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 9, 2025 Session

## STATE OF TENNESSEE v. MARION BROCK FOREMAN

**Appeal from the Circuit Court for Henderson County**
**No. 22-160-3   Kyle C. Atkins, Judge**

_____

### No. W2024-01864-CCA-R3-CD

_____

The Defendant, Marion Brock Foreman, was convicted at a bench trial by the Henderson County Circuit Court of twenty counts of possession of a firearm by a person convicted of a felony drug offense and one count of possession of drug paraphernalia. *See* T.C.A. § 39-17-1307 (Supp. 2021) (subsequently amended) (unlawful possession of a firearm); § 39-17-425 (2018) (possession of drug paraphernalia). He was found not guilty of ten counts of possession of a firearm with the intent to go armed during the commission of a dangerous offense involving the felony sale or delivery of a controlled substance and two counts of possession of a controlled substance with the intent to sell or deliver. After merger, he received an effective sentence of eight years with a 35% release eligibility for five counts of possession of a firearm by a person convicted of a felony drug offense and one count of possession of drug paraphernalia. On appeal, the Defendant contends that the trial court erred in denying his motion to suppress the evidence derived from the search of his property and home. We conclude that the trial court erred, reverse the judgments of the court, vacate the convictions, and remand the case for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed;
Convictions Vacated; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and TOM GREENHOLTZ, JJ., joined.

C. Mark Donahoe (at trial and on appeal) and James Andrew Farmer (on appeal), Jackson, Tennessee, for the Appellant, Marion Brock Foreman.

Jonathan Skermetti, Attorney General and Reporter; Edwin Alan Groves, Assistant Attorney General; Jody Pickens, District Attorney General; Chadwick R. Wood, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to an unrelated police helicopter search for a fleeing suspect and the helicopter's flyover of the Defendant's property during which police saw what were thought to be marijuana plants in the Defendant's backyard. The Defendant appeared to see the police helicopter and carried the plants into the woods. Police entered the Defendant's property, located the Defendant behind his home, and arrested him. While in police custody, the Defendant was advised of his *Miranda* rights while outside his home and then accompanied officers into his home, where officers opened closed containers and a gun safe that contained what appeared to be marijuana, drug paraphernalia, and firearms. The items were seized, and the Defendant was indicted for twenty counts of possession of a firearm by a person convicted of a felony drug offense, ten counts of possession of a firearm with the intent to go armed during the commission of a dangerous offense, two counts of possession of a controlled substance with the intent to sell or deliver, and one count of possession of drug paraphernalia.

## Pretrial Suppression Hearing

At a December 12, 2022 pretrial hearing, the Defendant moved to suppress the evidence derived from Tennessee Highway Patrol (THP) Sergeant Lee Russell's helicopter flyover and THP Trooper Jeremy Pratt's subsequent search of the Defendant's property and home.

Trooper Pratt testified that on November 2, 2021, he assisted in the search for a fleeing suspect in the vicinity of the Defendant's property. He stated that Sergeant Russell told him that Sergeant Russell saw marijuana on the Defendant's property. Trooper Pratt said that he parked his vehicle off the public road in front of a gate that was blocking the Defendant's driveway and walked around it. He stated that he and Trooper Cedric Myles found the Defendant outside the home carrying what appeared to be marijuana plants. He said that he arrested the Defendant, advised him of his *Miranda* rights, and handcuffed him. Trooper Pratt stated that the Defendant wanted to contain a fire within a wood-burning stove inside the home before leaving the property and that the Defendant "told me that he had – there was more marijuana inside the house." When questioned about whether the Defendant asked the trooper to go into the home, Trooper Pratt responded, "I would not have allowed [the Defendant] to go in there by himself. I think that would present some officer safety issue." He noted that the Defendant was handcuffed when inside the home.

Trooper Pratt testified that when he entered the Defendant's home, he smelled marijuana and saw marijuana in the Defendant's bedroom from the entry area. Trooper Pratt stated, "We ended up going into the bedroom and [the Defendant] told me where the

-2-

rest of his marijuana was. [The Defendant] pointed to a plastic container that was . . . on the floor, . . . kind of next to a gun safe." Trooper Pratt said that he found several jars of marijuana, digital scales, and plastic bags in the container. He said the Defendant "mentioned to me that there were firearms in the residence when we were outside" and he later said, "there was more marijuana in the safe. And I opened the safe and -- and there was some marijuana inside of it too." He noted that the Defendant never objected to his presence inside the home.

On cross-examination, Trooper Pratt acknowledged that Trooper Myles was present during the arrest of the Defendant and the search of the Defendant's property and home. He agreed that the Defendant's gate had a "no trespassing" sign attached to it and that when standing at the gate, he saw no contraband on the Defendant's property or in the Defendant's possession. He said that he and Trooper Myles had their guns drawn when they arrested the Defendant. He agreed that he did not have the Defendant sign a "waiver of rights" form before entering the Defendant's home. He stated that when he entered the Defendant's home, he could see the wood-burning stove from the entrance area and that he removed the Defendant's handcuffs in order for the Defendant to extinguish the fire. Trooper Pratt said he did not receive training that allowed him to distinguish between hemp and marijuana. He agreed that he handcuffed the Defendant after the Defendant extinguished the fire. Trooper Pratt did not believe anyone was hiding in the home. He did not remember telling the Defendant before he and the Defendant entered the home that a search of the home would occur.

On redirect examination, Trooper Pratt testified that the gate only obstructed the driveway and did not connect to a fence and that the distance from the gate to the Defendant's home was approximately two hundred feet.

The transcript of Sergeant Russell's preliminary hearing testimony was read into evidence because the witness was unavailable to testify. Sergeant Russell testified that he conducted a helicopter search for an unrelated suspect when he flew over the Defendant's property, on which he saw "four plants and a small greenhouse that you could pretty much lift up and cover the plants during the frost [. . .] which appeared [to be] removed for the sunlight that day." He said that the Defendant threw a black trash bag into a truck bed and that "[the Defendant] proceeded over to the plants, removed the plants, and ran off in the woods." Sergeant Russell contacted Trooper Pratt to go to the Defendant's property.

On cross-examination, Sergeant Russell testified that he believed the area where he saw the marijuana plants was an "open field." He did not know his exact altitude. He acknowledged that federal regulations provided no minimum altitude for the helicopter flyover of the Defendant's property. He said that records did not exist indicating how high he was flying over the Defendant's property. He agreed that Tennessee legalized hemp on July 1, 2019, and that hemp and marijuana were the same plant. He stated that he could

not determine from the helicopter whether the plants were marijuana or hemp. He said that Trooper Pratt went to the Defendant's property minutes after Sergeant Russell identified the plants on the Defendant's property and that there would not have been enough time for Trooper Pratt to obtain a search warrant before he entered the Defendant's property.

Tommy Walls, the Defendant's neighbor, testified that the helicopter flew over his and the Defendant's properties and that the helicopter flew at a height close to treetop level and lower than a cellphone tower.

On cross-examination, Mr. Walls testified that the police helicopter flew "so low you thought it was looking for a place to land[.]" He stated that "Medivac flies over about every day" and that Medivac helicopters fly "way up in the air."

The trial court stated in its findings, "that based upon the totality of the circumstances that [. . .] the trooper did testify that it was marijuana. I know there's some testimony in there about the difference between marijuana and hemp, but I think he's just got to have reasonable suspicion." The court determined that the Defendant's throwing plastic bags into his truck established exigent circumstances. The court found that the "circumstances of the [*Christensen*] case, that the warrant -- that the search was proper and I'm going to deny the motion." *See generally State v. Christensen*, 517 S.W.3d 60 (Tenn. 2017).

**Trial**

Trooper Pratt testified that he arrived at the Defendant's property on November 2, 2021, to respond to Sergeant Russell's report of marijuana on the property. He stated that he found the Defendant with what appeared to be marijuana plants in a wooded area behind the Defendant's home and arrested him. The plants were received as exhibits. He recalled that the Defendant asked to extinguish a fire in the wood-burning stove in his home and retrieve a cell phone. Trooper Pratt agreed that he followed the Defendant inside the home to maintain officer safety. He recalled that he smelled and saw marijuana plants in the home as soon as he entered. He stated that once the fire was extinguished, he and the Defendant entered the bedroom and that the Defendant said more marijuana was in plastic containers and in a gun safe within the bedroom. Trooper Pratt said that he found several jars of marijuana in the containers and more marijuana and guns in the gun safe. He said the gun safe's key was in the lock.

On cross-examination, Trooper Pratt testified that he walked around the Defendant's driveway gate to enter the Defendant's property. He stated that he entered the Defendant's property due to the information conveyed to him about what was seen during a police flyover of the Defendant's property. Trooper Pratt said that he only observed contraband on the Defendant's property when he located the Defendant carrying marijuana plants. He

recalled that he placed the Defendant in handcuffs when he found the Defendant. He acknowledged that there was no threat of evidence being destroyed within the home once the stove's fire was extinguished. He stated that he searched the Defendant's home to ensure that no one else was within the home. He said that he waited with the Defendant, inside the Defendant's home, until other officers arrived. He acknowledged that the Defendant did not sign a "consent form" to search the home and that no search warrant was obtained. He said that he first saw a marijuana plant when he entered the bedroom with the Defendant and not from the front door.

The transcript of Sergeant Russell's preliminary hearing testimony was received as an exhibit at trial because the witness was unavailable to testify. The transcript was identical with Sergeant Russell's testimony provided at the pretrial suppression hearing.

Former Trooper Baron Cooper testified that he was in the THP Criminal Interdiction Unit at the time of the Defendant's arrest. He stated that he arrived at the Defendant's home and observed multiple bags of what he believed was marijuana and several guns inside the home. He noted that the Defendant's gun safe was accessible because the key was in the lock. The bags of purported marijuana, bags of marijuana seeds, and drug paraphernalia that Mr. Cooper found in the Defendant's bedroom were received as exhibits. Mr. Cooper stated that the items he found were indicative of a person's intent to sell drugs. Mr. Cooper stated that five firearms and several thousand rounds of ammunition were retrieved from the Defendant's safe and were received as exhibits.

On cross-examination, Mr. Cooper testified that the gate to the driveway was unlocked and that when he arrived, troopers were standing outside the home and that no one was in the Defendant's home. He agreed that he never met or had a conversation with the Defendant at the Defendant's home. He stated that he and another trooper searched the home and that he alone retrieved the evidence from the home. He agreed that the gun safe could not be seen from the front door of the home and that it was open when he arrived. He stated that the drug paraphernalia he seized was in the Defendant's bedroom.

Tennessee Bureau of Investigation Special Agent Rachel Strandquist testified that she was a forensic scientist. She stated that she tested the plant material seized from the Defendant's bedroom and determined that it weighed more than 214 grams and was "presumptively marijuana." A report of her findings was received as an exhibit.

On cross-examination, Agent Strandquist testified that her tests indicated that the plant material she tested had a higher tetrahydrocannabinol (THC) content than cannabidiol (CBD). She agreed that the color tests she conducted only led to a presumption that the plant material was marijuana and not hemp. She acknowledged that only a gas chromatograph test could determine whether the plant material was conclusively marijuana and not hemp and that no such test was conducted. She stated that she only tested one

package of plant material and that the other packages' plant material differed from the one package tested.

At the close of the State's proof, the Defendant, without objection by the State, asked to "reassert" his motion to suppress the evidence seized from the Defendant's property. The Defendant argued that Trooper Cooper's warrantless entry into the home, after Trooper Pratt exited, required that the evidence retrieved by Trooper Cooper from the Defendant's home be suppressed because no warrant exception existed. Additionally, the Defendant contended no evidence established that the Defendant consented to a warrantless search of his home. The State responded that the Defendant freely entered the home with Trooper Pratt, Trooper Pratt saw marijuana in plain view and that the Defendant told Trooper Pratt where the other contraband was located. The State contended that if Trooper Pratt's search of the home was improper, the evidence derived from the search would be admissible under the inevitable discovery doctrine. The trial court credited the testimony of Trooper Pratt. The trial court made oral findings that the Defendant "took [Trooper Pratt] into the bedroom, opened the safe for him, showed him the marijuana." The court determined that "although the trooper could have asked for a warrant [. . .] I think the inevitable discovery rule would preclude suppression of this, based on the facts of this case." The court denied the Defendant's motion. Upon this evidence the trial court found the Defendant guilty of the unlawful possession of a firearm by a person convicted of a felony drug offense counts and the possession of drug paraphernalia count and not guilty of the remaining offenses.

On appeal, the Defendant contends that the trial court erred in denying the Defendant's motion to suppress because the police flyover was an unconstitutional search under *Florida v. Riley*, that the warrantless entry of the Defendant's property was not supported by exigent circumstances, and that the Defendant did not consent to the search of his bedroom. *See generally* 488 U.S. 445, 450-51 (1989) (plurality op.). The State counters that the court properly denied the Defendant's motion to suppress. The State posits that the police flyover was constitutional under the open fields doctrine, that the entry of the Defendant's property was constitutional due to exigent circumstances, and that the Defendant consented to the search of his home. The State does not argue inevitable discovery on appeal even though the State argued, and the trial court found, at the renewed suppression hearing during the trial that the search of the Defendant's home was proper under the inevitable discovery doctrine.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Warrantless seizures are "presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the . . . seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629

(Tenn. 1997); *see Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000).

The protections of the Fourth Amendment are implicated when the government either trespasses on a constitutionally protected area or invades an individual's reasonable expectation of privacy. *See United States v. Jones*, 565 U.S. 400, 407-09 (2012) (holding "the *Katz* reasonable-expectation-of-privacy test has been *added to,* not *substituted for,* the common-law trespassory test.") (emphasis in the original); *Katz v. United States*, 389 U.S. 347, 360 (1967) (plurality op.) (Harlan, J., concurring). An individual's reasonable expectation of privacy can extend to his home and its curtilage, but not open fields. *See United States v. Dunn*, 480 U.S. 294, 300 (1987); *see also State v. Jennette*, 706 S.W.2d 614, 619 (Tenn. 1986).

However, police action does not implicate Fourth Amendment protections when they see contraband "from a public vantage point where [they have] a right to be." *California v. Ciraolo*, 476 U.S. 207, 213 (1986). Parts of a home or its curtilage that are exposed to a public vantage point may not be subject to Fourth Amendment protections. *Id*. at 213-14 (holding that a naked eye identification of marijuana in a Defendant's backyard during a police flyover at an altitude of 1,000 feet did not violate the Defendant's reasonable expectation of privacy). A person generally does not have a reasonable expectation of privacy in what is viewable by the naked eye from a public airway. *Id*. When a police flyover is within the navigable airspace allowed by law and regulation, the flyover is less likely to implicate Fourth Amendment protections. *Riley*, 488 U.S. at 450-51.

Exigent circumstances dispense with the warrant requirement when "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)). Exigent circumstances arise "only where the State has shown that the search is imperative." *State v. Meeks*, 262 S.W.3d 710, 723 (Tenn. 2008). Our supreme court has stated that "the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." *Id.* Mere speculation, however, is insufficient to establish exigency. *Id.* at 723-24. The State "must rely upon specific and articulable facts and the reasonable inferences drawn from them." *Id.* at 724. "The circumstances are viewed from an objective perspective," and the officer's subjective intent is irrelevant. *Id.*

> Although this list is not exhaustive, [our supreme court has] held that exigent circumstances justifying a warrantless search may exist: (1) when officers are in hot pursuit of a suspect, (2) when immediate police action is needed to thwart the escape of a suspect, (3) when immediate police action is necessary

to prevent the destruction of evidence, (4) when the suspect presents an immediate threat to police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury.

*State v. Hutchinson*, 482 S.W.3d 893, 916 (Tenn. 2016) (internal citations omitted).

Consent is an exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Totality of the circumstances is the test used for determining whether an individual voluntarily consented to a search under the Tennessee and federal constitutions. *State v. Cox*, 171 S.W.3d 174, 184 (Tenn. 2005) (citing *Schneckloth*, 412 U.S. at 228). Consent must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *Id*. A court may consider the following factors when evaluating the voluntariness of consent:

1. Time and place of the encounter;
2. Whether the encounter was in a public or secluded place;
3. The number of officers present;
4. The degree of hostility;
5. Whether weapons were displayed;
6. Whether consent was requested; and
7. Whether the consenter initiated contact with the police.

*Id*. at 185 (articulating a non-exhaustive list of factors to consider when evaluating the voluntariness of consent). A defendant's "age, education, intelligence, knowledge, maturity, sophistication, experience, prior contact with law enforcement personnel, [] prior cooperation or refusal to cooperate with law enforcement personnel [, and k]nowledge of the right to refuse consent" may also be considered when evaluating the voluntariness of consent. *Id.* Evaluating consent to enter a home "will not be lightly inferred, nor found by mere acquiescence to unlawful authority." *State v. Clark*, 844 S.W.2d 597, 599 (Tenn. 1992). Whether consent exists is a question of fact. *Cox*, 171 S.W.3d at 185.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *Yeargan*, 958 S.W.2d at 629. In reviewing a trial court's ruling on a motion to suppress, this court may consider the trial

evidence as well as the evidence presented at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); s*ee also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

**Police Flyover**

The Defendant contends that the trial court erred in its determination that the helicopter flyover of the Defendant's property did not violate his Fourth Amendment rights. The Defendant argues that Justice O'Connor's concurring opinion in *Riley* is binding and mandates that the police flyover constituted an unconstitutional search under the Fourth Amendment because the flyover was not consistent with the public use of the airways over the Defendant's property and that the court erred by "ignoring" Justice O'Connor's concurring opinion by its reliance on the plurality's holding. The State counters that the court did not err and that the flyover of the Defendant's property did not constitute a search under the Fourth Amendment. We agree with the State.

The Defendant bears the burden of demonstrating that a challenged police action constituted a search implicating Fourth Amendment protections. *See Christensen*, 517 S.W.3d at 72 n.8. Thus, before the burden shifts to the State to justify a warrantless search, the Defendant must first establish that the conduct at issue invaded a constitutionally protected area or violated a reasonable expectation of privacy. *See Jones*, 565 U.S. at 407-09; *Katz*, 389 U.S. at 360. The Tennessee Supreme Court has held that when analyzing an aerial observation, "no greater protection is afforded by the Tennessee Constitution [.]" *State v. Prier,* 725 S.W.2d 667, 670 (Tenn. 1987).

The Defendant argues that Justice O'Connor's concurrence controls because she and the dissenters agreed on the test to be used and only differed as to which party had the burden to prove that the police action deviated from the local area's public use of the airways. *See Riley*, 488 U.S. at 452-67 (plurality opinion) (O'Connor, J., concurring) (Brennan, Marshall, Stevens, and Blackmun, JJ., dissenting). The Defendant relies upon *Marks v. United States* to advance his position that Justice O'Connor's concurring opinion is the controlling opinion in *Riley* because the concurring opinion constitutes "the holding of the Court [. . .] taken by those Members who concurred in the judgments on the narrowest grounds." *See Marks,* 430 U.S. 188, 193 (1977).

However, the Defendant fails to recognize that *Marks* states that only the holdings of the justices that "concurred in the judgments" would be controlling. *Id.* The four-Justice plurality in *Riley* concluded that the helicopter flyover did not constitute a search because the aircraft operated within navigable airspace and in compliance with applicable federal aviation regulations. *See Riley*, 488 U.S. at 451-52 (plurality opinion). Justice O'Connor concurred in the determination that there was not a search, but she proposed a fact-intensive inquiry, that weighed compliance with applicable federal aviation regulation and focused

on whether the search flyover was consistent with the ordinary use of the airways. *Id.* at 454-55 (O'Connor, J., concurring). Justice O'Connor's concurrence rests on a different constitutional rationale than the plurality. *Id.* at 451-55. Therefore, her concurrence does not constitute the controlling opinion under *Marks*. 430 U.S. at 193. The narrowest grounds between the plurality and concurring opinions in *Riley* relegate compliance with FAA regulations and other laws as a factor to be considered when determining whether a police flyover implicates Fourth Amendment protections. *See Riley*, 488 U.S. at 451-52. The trial court therefore did not err in declining to treat Justice O'Connor's concurrence as controlling authority.

Mr. Walls testified at the suppression hearing that the police helicopter flew "so low you thought it was looking for a place to land[.]" He stated that "Medivac flies over about every day" and that the helicopters fly "way up in the air." Sergeant Russell testified that he was flying in the area of the Defendant's property searching for an unrelated fleeing suspect and as he flew over the Defendant's property, he observed the Defendant standing next to what appeared to be marijuana plants and throwing a plastic bag into the back of a truck. No evidence was offered to show that FAA regulations required helicopters to maintain a minimum altitude, and no evidence was presented to show that Sergeant Russell flew the helicopter in a way that endangered people or property. *See* 14 CFR § 91.119(d)(1)-(2) (2010).

Sergeant Russell was in public airspace when he flew over the Defendant's property and identified the contraband. Accordingly, Sergeant Russell did not trespass on a constitutionally protected area when he saw the contraband on the Defendant's property. *See Ciraolo*, 476 U.S. at 213-14. The record reflects that Sergeant Russell was flying over the Defendant's property to look for an unrelated fleeing suspect and not to observe the Defendant or contraband. Additionally, the greenhouse cover that was lying beside the plants effectively removed any visual barrier that might have hidden them from anyone flying over the Defendant's property. No testimony established the distance of the plants from the Defendant's home, and no testimony established the plants were in the home's curtilage. The Defendant's actions do not establish a subjective intent to hide the plants from aerial view, and the Defendant had no reasonable expectation of privacy in the observation of the exposed plants. *See Dunn*, 480 U.S. at 300; *see also Jennette*, 706 S.W.2d at 619. Therefore, Sergeant Russell's helicopter flyover did not constitute a search with the meaning of the Fourth Amendment. The court properly denied relief on this ground.

**Entry onto the Defendant's Property**

The Defendant contends that the warrantless entry of his property by Trooper Pratt and Trooper Miles was unconstitutional and that all evidence derived from the entry should be suppressed. The State counters that the police had probable cause to enter the

Defendant's property to prevent the destruction of evidence and that the exigent circumstances exception to the warrant requirement applies to the troopers' entry of the property. We agree with the State.

The testimony at trial established that Sergeant Russell saw the Defendant fleeing into the woods behind his home with what Sergeant Russell believed to be contraband, that Sergeant Russell directed troopers to enter the Defendant's property to prevent the destruction of evidence, and that troopers entered the Defendant's property. Sergeant Russell's observation of the Defendant and his running into the woods with what appeared to be marijuana gave the troopers probable cause to believe that the Defendant was engaged in criminal activity. The Defendant's actions after he saw the helicopter flyover established exigent circumstances that permitted the troopers to enter the Defendant's property before obtaining a warrant in order to prevent the immediate destruction of the suspected marijuana. *See Meeks*, 262 S.W.3d at 723. Accordingly, the troopers' warrantless entry onto the Defendant's property to locate the Defendant and the apparent contraband was constitutional.

**Entry into the Defendant's Home**

The Defendant contends that he did not provide voluntary and unequivocal consent for Trooper Pratt to search the closed containers and the safe in the Defendant's bedroom. The State counters that the Defendant never objected to Trooper Pratt's search of the containers and the safe in the bedroom and that the search was constitutionally permissible due to the Defendant's actions. We agree with the Defendant.

After the State rested at the trial, the Defendant moved the trial court to reconsider the motion to suppress the evidence seized from the home. At this hearing, the court credited Trooper Pratt's testimony and found that the Defendant "took [Trooper Pratt] into the bedroom, opened the safe for him, [and] showed him the marijuana." However, the record preponderates against the court's factual findings because Trooper Pratt's credited testimony was, "I opened the safe."

Trooper Pratt is the only credited witness who testified about the circumstances surrounding the entry into the Defendant's home. Trooper Pratt did not testify that the Defendant invited the trooper into the home or consented to Trooper Pratt's entry into the home. Trooper Pratt's testimony establishes that the Defendant wished to enter the home to retrieve a cell phone and to extinguish a fire in a wood stove. When questioned whether the Defendant consented to Trooper Pratt's entry, Trooper Pratt merely responded that he followed the handcuffed Defendant into the home for "officer safety" reasons. Trooper Pratt said at the suppression hearing that he and the Defendant "ended up going into the bedroom." Trooper Pratt stated that, once in the bedroom, the Defendant "told," "pointed," and "mentioned" where evidence was located. Without any remarks or motions by the

Defendant, Trooper Pratt stated, "I opened the safe." Absent from Trooper Pratt's testimony is evidence of a clear, unequivocal consent to search the Defendant's bedroom and the closed containers and safe within the bedroom.

The State bears the burden to prove that a warrantless search was constitutional pursuant to an exception to the warrant requirement. *Yeargan*, 958 S.W.2d at 629; *see Coolidge*, 403 U.S. at 454-55; *Binette*, 33 S.W.3d at 218. Consent must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *Cox*, 171 S.W.3d at 184. The Defendant was handcuffed and in custody at the time consent was purportedly given. The encounter between the Defendant and police occurred behind the Defendant's home in a wooded area. The Defendant was alone with two troopers. Trooper Pratt testified that he and Trooper Miles had their guns drawn when they arrested the Defendant. Trooper Pratt testified that he advised the Defendant of his *Miranda* rights but did not provide the Defendant with a "waiver of rights" form. The record supports the trial court's finding that the Defendant asked to go into the home to retrieve a cell phone and to extinguish a fire. Trooper Pratt never testified, however, that the Defendant consented to the troopers' initial entry of the home, the entry of the bedroom, the opening of any closed container, and the subsequent entry into the home. The search of the Defendant's home went beyond the Defendant's request to enter the home for the purpose of extinguishing the fire and retrieving his cell phone. The trial court's denial of the Defendant's motion to suppress relied explicitly on the erroneous finding that the Defendant opened the gun safe for Trooper Pratt.

Trooper Pratt's credited testimony demonstrated that the Defendant admitted where contraband would be found within the home. However, Trooper Pratt's testimony does not support a reasonable inference that the Defendant consented to the opening of closed containers and safe in his bedroom. The record is silent as to the Defendant's consent for the search of his home. The State relies upon the Defendant's silence as affirmative proof of his consent. However, consent to enter a home and search "will not be lightly inferred, nor found by mere acquiescence to unlawful authority." *Clark*, 844 S.W.2d at 599. Accordingly, the State failed to carry its burden of proving that the Defendant consented to the search of his home. The warrantless search of the bedroom, closed containers, and gun safe violated the Defendant's Fourth Amendment right against unreasonable searches and seizures. The trial court erred by denying the Defendant's motion to suppress the evidence seized from the home.

In consideration of the foregoing and the record as a whole, we reverse the judgments of the trial court, vacate the convictions and remand for further proceedings consistent with this opinion.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE